**Deborah Sue HANCHETT, Plaintiff,**

v.

**Carolyn W. COLVIN, Acting Commissioner of Social Security, Defendant.**

**1:15-CV-00535 EAW**

United States District Court, W.D. New York.

Signed July 29, 2016

Elizabeth Ann Haungs, Kenneth R. Hiller, Law Offices of Kenneth Hiller, Amherst, NY, for Plaintiff.

Sergei Aden, Social Security Administration, New York, NY, for Defendant.

## DECISION AND ORDER

ELIZABETH A. WOLFORD, United States District Judge

## I. INTRODUCTION

Plaintiff Deborah Sue Hanchett ("Plaintiff"), represented by counsel, brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final decision of the Commissioner of Social Security ("the Commissioner") denying her application for Social Security Disability ("SSD") and Supplemental Security Income ("SSI") benefits. (Dkt. 1). Plaintiff alleges that the decision of Administrative Law Judge ("ALJ") Robert T. Harvey was not supported by substantial evidence in the record and was based on erroneous legal standards. (Dkt. 9-1 at 1).

Presently before the Court are the parties' opposing motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Dkt. 9; Dkt. 11). For the reasons set forth below, this Court finds that the decision of the Commissioner is supported by substantial evidence in the record and is in accordance with the applicable legal standards. Thus, the Commissioner's motion for judgment on the pleadings (Dkt. 11) is granted, and Plaintiff's motion (Dkt. 9) is denied. Plaintiff's complaint is dismissed.

## II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. Overview

On January 30, 2012, Plaintiff protectively filed an application for SSD and SSI benefits, alleging disability beginning January 1, 2011. (Transcript of Administrative Record (hereinafter "Tr.") at 164-77; 185-87).

Plaintiff's initial application was denied on June 21, 2012. (Tr. 90-95). Plaintiff requested a hearing and appeared, represented by counsel, to testify at the hearing held on September 26, 2013, before ALJ Harvey in Buffalo, New York. (Tr. 41-69). Vocational Expert ("VE") Jennifer Dziak also appeared and testified. (Tr. 69-80).

On November 20, 2013, the ALJ issued a decision determining that Plaintiff was not disabled within the meaning of the Social Security Act. (Tr. 21-40). The Appeals Council denied review on April 22, 2015, and the ALJ's decision became the final decision of the Commissioner. (Tr. 1-5). Plaintiff then commenced this action on June 19, 2015. (Dkt. 1).

### B. Non-Medical Evidence
#### 1. Plaintiff's Testimony

At the time of the hearing, Plaintiff was 49 years old, divorced, and living on her own. (Tr. 46). She was a licensed cosmetologist and certified Reiki master. (Tr. 47).

Plaintiff stated she had problems with anxiety, depression, post-traumatic stress disorder, fibromyalgia, and asthma. (Tr. 50). She would get anxious and "choke" from her anxiety, and would sometimes experience panic attacks in public. (Tr. 51). Plaintiff testified that she did not leave her house "very much" and would "sometimes panic thinking of leaving the house." (Tr. 52). With respect to her depression, Plaintiff testified that she would think negative thoughts and not want to do anything.

(*Id.*). Plaintiff claimed that she had four flashbacks in the previous two weeks. (*Id.*). When she experienced a flashback, Plaintiff testified that she learned to breathe and calm herself down. (*Id.*). She had seasonal depression with cold weather. (Tr. 65).

According to Plaintiff, she used to be a "people person" but was now fearful of people. (Tr. 53). Plaintiff had been abused as a child and in her marital relationship. (*Id.*).

Plaintiff claimed to experience pain in her lower back, legs, neck, shoulders, and head that was not consistent but would sometimes wake her up at night. (Tr. 55). She took pain medication three times per day. (*Id.*). Plaintiff stated she sometimes had tingling in her toes and fingers. (*Id.*). She did not experience muscle spasms, swelling, or cramping, but did experience weakness and fatigue. (Tr. 56).

Plaintiff testified that she could cook, clean, do dishes, do laundry, make her bed, vacuum, and sweep. (Tr. 61). She did not do any yard work or take out her trash. (*Id.*). Her neighbor took out her garbage for her. (Tr. 67). She needed a friend to go with her grocery shopping, and stated that she had left carts in the store before because of her anxiety. (Tr. 62). Plaintiff testified that it was "very difficult" for her to leave her house if someone did not help her. (Tr. 68). Plaintiff could bathe and dress herself. (Tr. 62). She had difficulty sleeping at night and was on medication to help her sleep. (Tr. 63).

Plaintiff stated that she could sometimes lift up to twenty pounds and other times would drop a gallon of milk. (Tr. 63). She had inconsistent pain with walking, standing, sitting, reaching, pushing, pulling, bending, or climbing. (Tr. 63-64). Plaintiff testified that her dexterity was "not good." (Tr. 64).

### 2. Vocational Expert Testimony

At the administrative hearing, ALJ Harvey asked VE Dziak to consider a hypothetical person who could "lift or carry, push or pull, 20 pounds occasionally, 10 pounds frequently; could sit two hours in an eight-hour day and stand or walk six hours in an eight-hour day" with "occasional limitations in the ability to bend, climb, stoop, squat, kneel, crawl," "occasional limitations in regard to understand, remember, carry out detailed instructions," "occasional limitations in the ability to interact with the general public." (Tr. 70). The VE testified that such an individual could not perform Plaintiff's past relevant work as a cosmetologist or beauty shop manager, but could perform work as a marketing clerk or courier-messenger. (Tr. 73-74).

ALJ Harvey then asked the VE to consider the additional limitations of "occasional limitations in the ability to perform certain activities within a schedule and maintain regular attendance and occasional limitations in the ability to complete a normal work day or work week without interruptions from psychologically based symptoms." (Tr. 76). The VE opined that such an individual would not be able to sustain the position of a courier or marketing clerk full time as the hypothetical indicates that the individual would be working less than full time. (*Id.*).

### C. Summary of the Medical Evidence

The Court assumes the parties' familiarity with the medical record, which is summarized in relevant part below.

On January 21, 2012, and again on January 23, 2012, Plaintiff presented to the emergency departments of two Buffalo-area hospitals for complaints of increased depression, panic disorder, and agoraphobia. (Tr. 257-97, 299-303). Plaintiff reported that she had not worked for the past three months due to her inability to leave her

house. (Tr. 299). Plaintiff had a "very significant history of childhood abuse at the hands of her mother" and was experiencing flashbacks of the abuse that caused her to become "paralyzed by the anxiety." (*Id.*). Most of the information was provided to the emergency department by Plaintiff's friend, who insisted that Plaintiff receive treatment for her increasing symptoms. (*Id.*). The provider noted that Plaintiff's current episode was "precipitated not only by losing her boyfriend, but in the past year her sister has died of cancer and her father died of a heart attack." (*Id.*). Plaintiff's mother had schizophrenia and abused Plaintiff physically from an early age. (Tr. 300). Plaintiff was referred for outpatient treatment for PTSD and depression. (Tr. 303).

On January 26, 2012, and February 3, 2012, Plaintiff attended admission assessment sessions at Spectrum Human Services ("Spectrum"). (Tr. 307-10, 327-35). Plaintiff reported a "very recent onset of panic attacks and sense of trauma which she link[ed] to memories . . . of being mistreated badly during childhood by her mother." (Tr. 327). Plaintiff stated that she had received Xanax and Klonopin at prior hospital visits and believed the Klonopin was helping her symptoms. (*Id.*). The provider indicated that Plaintiff was able to work and become successful in her career with the help of medication management, but since her move to Buffalo was not on any medication and suffered flashbacks of past trauma. (*Id.*). Plaintiff stated she was unable to work because of her distrust and social anxiety when in public. (Tr. 328). Maraiel Faraco, LMSW, admitted Plaintiff for mental health counseling services. (Tr. 329).

On February 8, 2012, psychiatric nurse practitioner ("NP") Gerald Frisicaro prescribed Plaintiff Effexor and Gabapentin and advised Plaintiff to gradually discontinue Klonopin. (Tr. 311). On February 16, 2012, NP Fisicaro noted that Plaintiff discontinued Effexor after four days and had not taken Gabapentin. (Tr. 323). He prescribed Abilify and Xanax. (Tr. 323). On mental status examination, Plaintiff had a hyperactive and pressured affect, with loose thought processes and thought content characterized by recurrent intrusive recollections of trauma. (*Id.*). NP Frisicaro diagnosed bipolar II disorder and PTSD, with rule-out diagnoses of attention deficit hyperactivity disorder and bipolar I disorder. (*Id.*).

On February 23, 2012, Plaintiff returned to LMSW Faraco and reported a panic attack triggered by her door bell. (Tr. 313). She stated that her anxiety and panic did not allow her to return to work. (*Id.*).

On March 14, 2016, Plaintiff reported to LMSW Faraco that her medication was "really helping" her symptoms and that she had been "getting out more," but still experienced bad dreams and nightmares. (Tr. 314). On March 21, 2012, LMSW Faraco noted that Plaintiff experienced mental and physical pain from her flashbacks, but Plaintiff's social life had improved and she had a "very healthy support system." (Tr. 316).

On March 29, 2012, NP Frisicaro discontinued Ability and prescribed Xanax and Celexa. (Tr. 321).

Plaintiff started treatment at WNY Medical, P.C. on April 27, 2012. (Tr. 452). Plaintiff reported treating with Spectrum for psych and counseling for her PTSD and anxiety. (Tr. 453). Plaintiff complained of pain throughout her body that would become worse at night. (*Id.*). Physician's assistant ("PA") Amy Munro noted that Plaintiff had "significant post traumatic stress" and would need to "follow closely with spectrum counseling as well as with psychiatrist." (Tr. 454). She prescribed Lortab for pain management in connection with Plaintiff's fibromyalgia, "until we

[get] her stable with psych and then will pursue consult with pain management and or rheumatology." (*Id.*).

On May 23, 2012, psychologist Susan Santarpia conducted a consultative psychiatric examination. (Tr. 336-39). Plaintiff reported fluctuating sleep, fluctuating mood, loss of usual interest, social withdrawal, excessive apprehension and worry in social situations, and fluctuating flashbacks of abuse. (Tr. 337). On examination, Plaintiff had cooperative demeanor and responsiveness as well as an adequate manner of relating and overall presentation. (*Id.*). Dr. Santarpia diagnosed Plaintiff with depressive disorder, not otherwise specified, controlled; panic disorder without agoraphobia, stabilized; and anxiety disorder not otherwise specified. (Tr. 339). Dr. Santarpia opined that Plaintiff could: "follow and understand simple directions and instructions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, learn new tasks, make appropriate decisions, and appropriately deal with stress within normal limits." (Tr. 338). She further opined that Plaintiff had a mild impairment in performing tasks independently and relating adequately with others, with difficulty caused by fatigue. (Tr. 338-39). Ultimately, Dr. Santarpia concluded that "[t]he results of the present evaluation appear to be consistent with psychiatric problems, but in and of itself do[ ] not appear to be significant enough to interfere with the claimant's ability to function on a daily basis." (Tr. 339).

On May 23, 2012, Plaintiff also underwent a consultative internal medicine examination, conducted by Donna Miller, D.O. (Tr. 341-44). D.O. Miller opined that Plaintiff "should avoid any dust, irritants, or tobacco exposure which may exacerbate her asthma." (Tr. 344). Further, she noted that Plaintiff "has mild limitation for heavy lifting, bending, and carrying." (*Id.*).

On May 25, 2012, State agency psychological consultant Dr. C. Butensky assessed Plaintiff's records and opined that Plaintiff's severe psychiatric impairment had improved with treatment such that her impairments were now "mild to moderate" and not meeting or equaling any disability listing. (Tr. 357). Dr. Butensky further opined that Plaintiff retained the ability to: "perform simple and some complex job tasks; she has mild to moderate limitations in her ability to sustain attention/concentration, adapt to changes in a routine work setting, and interact appropriately with co-workers and supervisors." (*Id.*).

Spectrum notes dated July 11, 2012, indicated that Plaintiff needed to continue to work on her coping skills. (Tr. 421). Plaintiff was "motivated" to receive treatment, but was "struggling greatly with her financial troubles and her mental health symptoms related to her PTSD." (Tr. 424).

On November 15, 2012, providers at Spectrum noted that Plaintiff had developed the coping skills to meditate, walk away, and practice deep breathing, although her symptoms of PTSD caused "a great amount of difficulty socializing." (Tr. 432).

On December 24, 2012, Plaintiff was treated at Saint Josephs' Hospital Emergency Department for Bell's Palsy. (Tr. 445). Upon examination, Plaintiff was anxious, had facial drop on the left side of her face, and reported tingling and numbness in her left hand and left side of her body. (Tr. 441-42). Plaintiff was prescribed Prednisone and Valtrex. (Tr. 445).

NP Frisicaro continued to prescribe Plaintiff's pain and anxiety medications from May 2012 through September 2013. (Tr. 393-406). By September 5, 2013, Plaintiff was prescribed six different medications. (Tr. 406). PA Munro's treatment notes for various appointments between April 1, 2012 and March 31, 2013, largely

related to adjustments in Plaintiff's medications. (Tr. 459-518).

On January 17, 2013, Plaintiff was not taking any prescription medications and reported to NP Frisicaro that she was taking natural supplements. (Tr. 399). She stated that the past two years had been stressful and she was not "taking care of" herself, but was now taking care of herself "a lot better." (*Id.*). On February 12, 2013, NP Frisicaro restarted Plaintiff's prescriptions for Clonazepam and Seroquel XR. (Tr. 400).

On March 21, 2013, LMSW Faraco noted that Plaintiff was thinking about moving out of town. (Tr. 432). She was "very good at using her co[pi]ng skills, but lacks supports that are there for her." (*Id.*).

On June 5, 2013, LMSW Faraco wrote a letter in connection with Plaintiff's disability claim. (Tr. 523). LMSW Faraco stated that Plaintiff "continues to struggle with impulsivity, low stress tolerance, panic attacks, mood swings, memory impairment, and ... with the completion of daily activities of living." (*Id.*). She reported that Plaintiff "is observed to have an inability to focus on small tasks, such as cooking and shopping, based on information provided by herself and her collaterals." (*Id.*). In conclusion, LMSW Faraco stated that she would not recommend employment for Plaintiff, "as her psychiatric stability does not warrant it." (*Id.*). She further opined: "competitive employment would be contraindicated for [Plaintiff] and may be potentially harmful." (*Id.*). On October 8, 2013, Spectrum psychiatrist Jeffrey Kashin, M.D., issued an identical letter. (Tr. 519).

On June 12, 2013, Plaintiff reported to PA Munro that she was "sleeping so much better and feeling great." (Tr. 504). On July 17, 2013, Plaintiff informed PA Munro that she had recently experienced a panic attack in a Walmart parking lot and "could not drive." (Tr. 507). On August 14, 2013, Plaintiff reported that she was "going through a rough time now as she does this time every year." (Tr. 510).

In a letter dated October 28, 2013, PA Munro and Dr. Peter McQuiller of WNY Medical Group stated that they treated Plaintiff for depression, anxiety, and PTSD. (Tr. 526). They noted that Plaintiff also had fibromyalgia which causes "severe pain flares" when her PTSD "is flared." (*Id.*).

## III. DISCUSSION

### A. Standard of Review

This Court has jurisdiction to review the final decision of the Commissioner under 42 U.S.C. §§ 405(g) and 1383(c)(3). "In reviewing a decision of the Commissioner, the Court may 'enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner ... with or without remanding the cause for a rehearing.'" *Emerson v. Comm'r of Soc. Sec.*, No. 12 Civ. 6451(PAC)(SN), 2014 WL 1265918, at *9 (S.D.N.Y. Mar. 27, 2014) (quoting 42 U.S.C. § 405(g)). Title 42 U.S.C. section 405(g) directs the Court to accept findings of fact made by the Commissioner, so long as the findings are supported by substantial evidence in the record. Substantial evidence is "more than a mere scintilla," and "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938). "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles."

*Johnson v. Bowen,* 817 F.2d 983, 986 (2d Cir.1987).

■ Therefore, the scope of the Court's review is limited to determining whether the Commissioner applied the appropriate legal standards in evaluating the plaintiff's claim, and whether the Commissioner's findings were supported by substantial evidence on the record. *See Mongeur v. Heckler,* 722 F.2d 1033, 1038 (2d Cir.1983) (stating that a reviewing Court does not examine a benefits case *de novo*). If the Court finds no legal error, and that there is substantial evidence for the Commissioner's determination, the decision must be upheld, even if there is also substantial evidence for the plaintiff's position. *See Perez v. Chater,* 77 F.3d 41, 46 (2d Cir. 1996).

■ Judgment on the pleadings may be granted under Rule 12(c) where the material facts are undisputed and where judgment on the merits is possible merely by considering the contents of the pleadings. *Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 642 (2d Cir.1988).

### B. Determining Disability Under the Social Security Act

■ The Social Security Act provides that a claimant will be deemed to be disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A); *see Rembert v. Colvin,* No. 13–CV–638A, 2014 WL 950141, at *6 (W.D.N.Y. Mar. 11, 2014). A disabling impairment is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostics techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D). The burden is on the claim-

ant to demonstrate that she is disabled within the meaning of the Act. *See Draegert v. Barnhart,* 311 F.3d 468, 472 (2d Cir.2002). The individual will only be declared disabled if her impairment is of such severity that she is unable to do her previous work and cannot, considering her age, education, and work experience, engage in any other kind of substantial gainful activity. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

■ In making the disability determination, the ALJ follows a five-step sequential analysis. If the ALJ makes a determination at any step, the evaluation will not continue to the next step. 20 C.F.R. § 416.920(a)(4). The following five steps are followed:

1. The Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

2. If not, the Commissioner considers whether the claimant has a "severe impairment" which limits his or her mental or physical ability to do basic work activities.

3. If the claimant has a "severe impairment," the Commissioner must ask whether, based solely on medical evidence, the claimant has an impairment listed in Appendix 1 of the regulations. If the claimant has one of these enumerated impairments, the Commissioner will automatically consider him disabled, without considering vocational factors such as age, education, and work experience.

4. If the impairment is not "listed" in the regulations, the Commissioner then asks whether, despite the claimant's severe impairment, he or she has residual functional capacity to perform his or her past work.

5. If the claimant is unable to perform his or her past work, the Commissioner then determines whether there is other

work which the claimant could perform. The Commissioner bears the burden of proof on this last step, while the claimant has the burden on the first four steps. *Shaw v. Chater*, 221 F.3d 126, 132 (2d Cir.2000); *see* 20 C.F.R. §§ 404.1520, 416.920.

## C. The ALJ's Sequential Evaluation

In applying the five-step sequential analysis at the first step, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act and had not engaged in substantial gainful activity for the relevant time period. (Tr. 26).

At the second step, the ALJ determined that Plaintiff had the following severe impairments: fibromyalgia, anxiety, depression, panic disorder, and post-traumatic stress disorder. (*Id.*). ALJ Harvey noted that Plaintiff also complained of asthma, but concluded that the medical record did not establish that Plaintiff's asthma caused any significant work-related limitations of function. (Tr. 27).

At the third step, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment, specifically, listings 14.09, 12.04, and 12.06. (Tr. 13).

Based on these conclusions and an analysis of the evidence, the ALJ determined that Plaintiff had the residual functional capacity:

to perform light work as defined in CFR 416.967(b) and 416.967(b) except occasional limitations in bending, climbing, stooping, squatting, kneeling and crawling; occasional limitations in ability to: understand, remember and carry out detailed instructions; and interact appropriately with the general public; and the claimant retains the ability to perform basic mental demands of unskilled work including the ability to: understand, remember and carry out simple instructions; respond appropriately to supervision, co-workers and usual work situations; and deal with changes in routine work setting.

(Tr. 29).[1]

ALJ Harvey found that Plaintiff's testimony was "credible but not to the extent alleged." (Tr. 30). As part of the fourth step of the sequential analysis, the ALJ determined that Plaintiff was unable to perform any past relevant work. (Tr. 34).

The ALJ then proceeded to the fifth step, which is comprised of two parts. First, the ALJ assessed Plaintiff's job qualifications by considering her physical ability, age, and education. (Tr. 35). At the time of the hearing, Plaintiff was 49 years old, she had at least a high school education, and her past relevant work included cosmetologist and beauty shop manager, both light exertion and skilled work. (*Id.*). The demands of Plaintiff's past relevant work exceeded her residual functional capacity. (*Id.*). Second, the ALJ determined Plaintiff's ability to perform all or substantially all of the requirements of light work was impeded by her additional limitations. (*Id.*). Based on the VE's testimony that an individual with Plaintiff's RFC could perform the requirements of the representational jobs of marketing clerks and courier/messenger, ALJ Harvey concluded that Plaintiff was not disabled under the Act. (Tr. 36).

---

1. "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. §§ 404.1567(b), 416.967(b).

Plaintiff raises two primary arguments against the ALJ's determination: (1) that the ALJ "failed to properly evaluate the opinion of Plaintiff's treating social worker, resulting in a residual functional capacity finding not supported by substantial evidence" and (2) that the ALJ's credibility determination was "not supported by substantial evidence." (Dkt. 9-1 at 21, 25).

### 1. Letter Opinion of LMSW Faraco

■ Plaintiff contends the ALJ erred by failing to provide an explanation for his rejection of LMSW Faraco's opinion concerning the severity of Plaintiff's mental impairments in light of the "length and nature of Plaintiff's treating relationship with LMSW Faraco and the consistency of LMSW Faraco's opinion with Spectrum's treating records." (Dkt. 9-1 at 22). The Commissioner argues that ALJ Harvey "explicitly noted that Ms. Faraco was a social worker who completed a diagnostic review" and "extensively evaluated the otherwise entirely identical October 8, 2013 letter from Spectrum signed by Dr. Kashin" and therefore there is no basis for changing the ALJ's decision, even if the ALJ erred in not conducting a separate analysis of Faraco's letter. (Dkt. 11-1 at 14-16).

■ Although social workers are not "acceptable medical sources," they are included among the "other sources" whose opinions may be considered in evaluating a claimant's severity of impairment and ability to work. 20 C.F.R. § 416.913(d)(3). "The amount of weight to give such opinions is based in part on the examining and treatment relationship, length and frequency of the examinations, the extent of relevant evidence given to support the opinion, and consistency with the record as a whole." *Williams v. Colvin*, No. 15–CV–6119–FPG, 2016 WL 1466562, at *4 (W.D.N.Y. Apr. 14, 2016) (citing 20 C.F.R. § 416.927(c)). "Essentially, the Commissioner is free to decide that the opinions of other sources are entitled to no weight or little weight, but those decisions should be explained." *Id.* (quotations and citations omitted).

As previously noted, the June 5, 2013 letter of LMSW Faraco is identical, word for word, to the October 8, 2013 letter of Dr. Kashin. (Tr. 519, 523). In rendering his decision, ALJ Harvey provided a detailed analysis of the October 8, 2013 letter and his reasons for rejecting the conclusions of the letter in light of other opinions and the treatment notes in the record. (Tr. 34). For example, the ALJ noted that Dr. Kashin found Plaintiff continued to "struggle" with impulsivity, low stress tolerance, panic attacks, mood swings, memory impairment, and completion of daily activities of living, but the Spectrum treatment notes (created by LMSW Faraco) showed that Plaintiff discontinued medication management services for a period of time and was able to manage her symptoms by using coping skills and attending counseling services. (*Id.*). Further, the ALJ noted that a March 21, 2013 record from Spectrum (created by LMSW Faraco) documented that Plaintiff was considering moving out of town because she was good at using her coping skills but lacked the support system needed. (*Id.*). In sum, ALJ Harvey determined that Dr. Kashin's opinion that Plaintiff was unable to work was unsupported by the Spectrum treatment records. These treatment records were created by LMSW Faraco. (Tr. 432-33). Therefore, whether the ALJ had considered Dr. Kashin's letter or the identical letter of LMSW Faraco, his analysis of the evidence provided in the Spectrum records would not have changed. The ALJ determined the Spectrum records did not support a finding that Plaintiff was unable to work.

Although the ALJ did not assign any specific weight to the "other source" opinion of LMSW Faraco, any error (and the

Court does not conclude there was one) is harmless because the Court is able to glean the ALJ's reasoning with regard to LMSW Faraco's opinion based on his detailed analysis of Dr. Kashin's identical opinion. *See Battease v. Comm'r of Soc. Sec'y*, No. 3:15–CV–867, 2016 WL 3824146, at *8 n. 5 (N.D.N.Y. July 13, 2016).

#### 2. Credibility Determination

■ Plaintiff further argues that ALJ Harvey's credibility assessment was "based on mischaracterizations of the record and factors not indicative of a person's ability to perform substantial gainful activity." (Dkt. 9-1 at 25). The Commissioner contends that "a reasonable factfinder could consider as inconsistent with a claim of total disability evidence that Plaintiff maintained excellent grooming and appearance, quickly learned coping skills in treatment, and at one point felt well enough to decide to stop her medications" and the fact that Plaintiff offers a different interpretation of this evidence does not render the ALJ's findings unsupported by substantial evidence. (Dkt. 11-1 at 17-19).

The Social Security regulations require a two-step process for the ALJ to consider the extent to which subjective evidence of symptoms can reasonably be accepted as consistent with the medical and other objective evidence. *Brownell v. Comm'r of Soc. Sec.*, No. 1:05–CV–0588 (NPM/VEB), 2009 WL 5214948, at *3 (N.D.N.Y. Dec. 28, 2009). First, the ALJ considers whether the medical evidence shows any impairment "which could reasonably be expected to produce the pain or other symptoms alleged..." 20 C.F.R. § 404.1529(a). Second, if an impairment is shown, the ALJ must evaluate the "intensity, persistence, or functionally limiting effects" of a claimant's symptoms to determine the extent to which they limit the claimant's capacity to work. 20 C.F.R. § 404.1529(b). When the objective medical evidence alone does not substantiate the claimant's alleged symp-

toms, the ALJ must assess the credibility of the claimant's statements considering the details of the case record as a whole. 20 C.F.R. §§ 404.1529(c)(3)(i)–(vii).

■ In evaluating a plaintiff's credibility, the ALJ must consider several factors, including:

1. The individual's daily activities;

2. The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3. Factors that precipitate and aggravate the symptoms;

4. The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5. Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6. Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g. lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7. Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Stewart v. Barnhart*, 235 F.R.D. 579, 590 (W.D.N.Y.2006); *see* 20 C.F.R. § 404.1529(c).

Here, in considering Plaintiff's credibility, ALJ Harvey properly applied the two step analysis. First, the ALJ determined that Plaintiff's testimony was "credible but not to the extent alleged." (Tr. 30). Next, the ALJ considered the credibility of Plaintiff's testimony in light of the objective medical evidence and record as a whole. (Tr. 30-34). In doing so, ALJ Harvey considered and summarized, *inter alia*, Plaintiff's hearing testimony, emergency room records, Spectrum treatment

records, and the medical source statements of Dr. Santarpia, Dr. Miller, Dr. Putensky, and Dr. Kashin. (*Id.*).

Plaintiff argues that the ALJ should not have considered Plaintiff's grooming abilities, coping skills, or desire to stop medication as being indicative of better functioning. (Dkt. 9-1 at 26-27). While Plaintiff may disagree with the ALJ's conclusions with respect to her credibility as influenced by these considerations, the Court cannot say that the ALJ made some legal error in considering these aspects of Plaintiff's activities of daily living.

Ultimately, " '[i]t is the function of the [Commissioner], not [the Court], to resolve evidentiary conflicts and to appraise the credibility of the witnesses, including the claimant.' " *Aponte v. Sec., Dep't Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir.1984) (quoting *Carroll v. Sec. of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir.1983)). "The ALJ 'has discretion to evaluate the credibility of a claimant and to arrive at an independent judgment ... [which he must do] in light of medical findings and other evidence regarding the true extent of the pain alleged by the claimant.' " *King v. Astrue*, No. 12–CV–6186T, 2013 WL 3154129, at *8 (W.D.N.Y. June 21, 2013) (quoting *Mimms v. Heckler*, 750 F.2d 180, 186 (2d Cir.1984)) (alteration in original). "If 'after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, the ALJ decides to discredit plaintiff's claim of severe and disabling pain, that decision is supported by substantial evidence.' " *Drennen v. Astrue*, No. 10–CV–6007MAT, 2012 WL 42496, at *6 (W.D.N.Y. Jan. 9, 2012) (quoting *Pascariello v. Heckler*, 621 F.Supp. 1032, 1036 (S.D.N.Y.1985)).

"Because the ALJ's credibility analysis and factual findings are based on application of the proper legal principles, the Court may not examine the evidence and substitute its own judgment for that of the Commissioner." *Williams v. Comm. of Social Sec.*, 423 F.Supp.2d 77, 84 (W.D.N.Y. 2006).

## IV. CONCLUSION

For the foregoing reasons, the Commissioner's determination that Plaintiff was not disabled within the meaning of the Social Security Act is supported by substantial evidence. Accordingly, the Commissioner's motion for judgment on the pleadings (Dkt. 11) is granted, and Plaintiff's motion for judgment on the pleadings (Dkt. 9) is denied. Plaintiff's complaint is dismissed. The Clerk of Court is directed to close the case.

**SO ORDERED.**